IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Case No. 04-cv-01619-LTB-BNB

TINA GARCIA,

Plaintiff,

v.

BERKSHIRE LIFE INSURANCE COMPANY OF AMERICA, a wholly owned subsidiary of
the Guardian Life Insurance Company of America, and
THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, a foreign insurance
company,

Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

This is a case of egregious and repeated litigation misconduct by the plaintiff, Tina

Garcia.[1]

In November 2007, following an evidentiary hearing at which Ms. Garcia and others

testified (the "First Hearing"), I found that Ms. Garcia had fabricated four documents: (1) a

report, purportedly written by Patrick M. Renfro, an expert witness in vocational rehabilitation,

which Ms. Garcia submitted to the Colorado Board of Law Examiners in connection with her

application to sit for the Colorado bar examination; (2) a letter, purportedly written by Dr.

Robert Kooken, recommending that Ms. Garcia obtain treatment from a psychiatrist; (3) a letter,

---

[1]In the course of this case, Ms. Garcia has been represented by various lawyers.  She was
represented while the case was on appeal.  On remand, however, her counsel was allowed to
withdraw, and Ms. Garcia has proceeded *pro se*.  Although Ms. Garcia is not a member of the
bar of this court, and so far as I know has never been licensed to practice law in any jurisdiction,
she did graduate from law school and receive a law degree.

purportedly written by Earl Schoenborn, relied on by Ms. Garcia in sworn interrogatory responses as evidence that the defendants (collectively "Berkshire") breached the implied covenants of good faith and fair dealing, violated the Colorado Unfair Claim Practices Act, and engaged in deceptive trade practices; and (4) an e-mail string, purportedly between Ms. Garcia and Gene Lupia, tendered to the court by Ms. Garcia's lawyer during a hearing on discovery matters. As a result of Ms. Garcia's misconduct in fabricating these documents, I recommended that her claims be dismissed as a sanction for her abusive litigation practices. At that time, there was no evidence that Ms. Garcia's lawyer intentionally offered false evidence or suborned perjury, but I noted that the lawyer had been "duped by his client once into offering false evidence" and that "the risk is great that the same could happen again." Amended Recommendation [Doc. # 296, filed 11/29/2007] at p. 16 n. 2. I also stated that I had "absolutely no confidence that the plaintiff would not attempt to offer additional false evidence," and that "[t]he risk that this court might issue judgment against the defendants based on the plaintiff's fabrications and lies is simply too great to allow the case to proceed." Id. at p. 16.

The district judge adopted my recommendation as one basis for dismissing Ms. Garcia's case. See Order [Doc. # 305, filed 12/27/2007]. The United States Court of Appeals for the Tenth Circuit, in an Opinion and Judgment [Doc. # 401] entered on June 10, 2009, affirmed the judgment of the district court dismissing Ms. Garcia's action as a sanction for her abusive litigation practices of willfully, knowingly, and intentionally fabricating the four documents. Garcia v. Berkshire Life Ins. Co. of America, 569 F.3d 1174 (10th Cir. 2009).

On appeal, it was alleged that Ms. Garcia had submitted to the circuit court "new false evidence . . . *after* the imposition of the dismissal sanction." Id. at 1182 (original emphasis).

Consequently, the circuit court remanded the case with the following explanation and

instructions:

> In her reply brief on appeal, Ms. Garcia cited a letter from Craig Durkin, the former Director of the Office of Procurement and Contracts at HUD, supposedly exonerating her from the agency's criminal investigation.  But Mr. Durkin has denied writing the letter and questioned its authenticity.  Likewise, Berkshire has raised questions about two other documents relied upon by Ms. Garcia after the district court's dismissal of her case: new evidence that Ms. Garcia supposedly authorized the release of her medical records in 2003-04 and a new version of the Renfro report previously found fabricated in the district court's sanctions ruling.  The district court, in resolving Ms. Garcia's Fed. R. Civ. P. 60(b) Motion for Relief from Order, noted that "Berkshire has a strong argument in support of its claim that the new authorizations . . . are fabrications."
>
> An appeal is not frivolous per se just because the presentation of the issues in district court was bad enough to be sanctionable.  On the other hand, an appeal may be frivolous if it consists of irrelevant and illogical arguments *based on factual misrepresentations and false premises*, or when the result is obvious, or the appellant's arguments of error are wholly without merit.  We believe that if these new documents turn out to have been fabrications, it follows that the appeal was based in part on factual misrepresentations, making appellate-level sanctions appropriate.
>
> There have been no explicit factual findings regarding the authenticity of the Durkin letter, the medical records release, or the version of the Renfro report submitted to the court.  As an appellate court, we have no capacity to engage in such fact-finding.  We therefore remand this case to the district court for the limited purpose of determining whether these three documents were fabricated and if so, whether the fabrication was intentional.  If the district court answers both questions in the affirmative, we request that the district court calculate a reasonable award of attorney's fees for the appeal.  Upon conclusion of these factual findings, we retain jurisdiction to make the ultimate determination as to whether and what fees to award under Fed. R. App. P. 38.

<u>Id</u>. at pp. 1182-83 (internal quotations and citations omitted)(original emphasis).

I held an evidentiary hearing on December 20, 2010, on the issues submitted on remand (the "Evidentiary Hearing").  Despite notice of the hearing, and without any explanation, Ms. Garcia failed to attend.  Based on the unrebutted and overwhelming evidence presented at the Evidentiary Hearing, I find that Ms. Garcia intentionally and knowingly fabricated the documents identified by the circuit court, and many others, and engaged in other misconduct on remand.  I find that a reasonable award of attorneys fees in light of Ms. Garcia's misconduct on appeal and on remand is $87,737.50.

## I.

Berkshire asks that I make my findings of fact concerning the fabrication of evidence "not only by a preponderance of the evidence but by clear and convincing evidence."  Transcript of Proceedings on December 20, 2010 [Doc. # 507, filed 12/30/2010] ("Trans.") at p. 110 lines 16-20.  The request appears to spring from this court's decision in Gates Rubber Co. v. Bando Chemical Industries, Ltd., 167 F.R.D. 90, 108-09 (D. Colo. 1996), where Magistrate Judge O. Edward Schlatter ruled:

> I found no opinion or decision of the Tenth Circuit which provided a discussion of the burdens of proof which should apply in cases where sanctions are sought.  In the First Circuit, the Court in Anderson [v. Cryovac, 862 F.2d 910, 925 (1st Cir. 1988),] found that in circumstances which would warrant extreme sanctions the movant must prove the opponent's misconduct the same as one would prove fraud or misrepresentation--by clear and convincing evidence.  Id. at 923. . . .
>
> Other courts have held that dispositive sanctions may be ordered where discovery violations are demonstrated by a preponderance of the evidence.  General Atomic Co. v. Exxon Nuclear Co., 90 F.R.D. 290, 296 (S.D. Cal. 1981). . . .  In Carlucci v. Piper Aircraft Corp., [102 F.R.D. 472 (S.D. Fla. 1984),] the trial judge did not articulate a burden of proof, but found that "plaintiffs have presented convincing and consistent" evidence to support a finding

of intentional destruction of documents, and to support the request for default judgment.  102 F.R.D. 472, 485 (S.D. Fla. 1984).

I conclude that the burden of proof for sanctions should be as stringent as the circumstances require.  If a judge intends to order a dismissal or default judgment because of discovery violations, the judge should do so only if the judge is impressed to do so by evidence which is clear and convincing.  To do otherwise would be to contravene the strong public policy which favors adjudication on the merits.  [Citations omitted.]  The burden of proof under which a trial is governed is "preponderance of the evidence."  To remove from a party the right to have a trial in the first place should require much more than a mere preponderance.  Dismissal, default judgment and even presumptions and orders of preclusion are sanctions which deny a party's full rights to a trial on the merits.  The elimination of valued rights should not occur in the absence of a degree of proof which reflects the very serious nature of the decision.

If a judge is not persuaded to enter dismissal or default judgment by virtue of clear and convincing evidence, the judge may still impose lesser sanctions if a need is shown by a preponderance of the evidence.  Where lesser sanctions are imposed, the rights of the parties to a trial on the merits are not completely defeated.  Lesser sanctions serve a different purpose than dispositive sanctions.

Unlike the <u>Gates Rubber</u> case, the issue now before me is not whether the action should be dismissed as a sanction for abusive litigation practices.  The issue here is whether Ms. Garcia intentionally fabricated documents and relied on them in the course of her appeal, justifying an award of appellate-level sanctions by the circuit court under Fed. R. App. P. 38.  There is some authority in other jurisdictions indicating that an award of sanctions under Fed. R. App. P. 38 "requires a clear showing."  <u>West Virginia v. Chas. Pfizer & Co., Inc.</u>, 440 F.2d 1079, 1092 (2d Cir. 1971); <u>accord</u> <u>Schiff v. United States</u>, 919 F.2d 830, 834 (2d Cir. 1990).  I have found no decision of the Tenth Circuit imposing a heightened standard of proof before an award may be made under Rule 38.  The authority, instead, requires merely a finding, which implies a finding

by a preponderance of the evidence.  For example, in <u>Lewis v. Circuit City Stores, Inc.</u>, 500 F.3d

1140, 1153 (10th Cir. 2007), the circuit court stated:

> We have stated . . . that we do not take sanctions decisions lightly.
> . . .  Examples of when we have found sanctions appropriate
> include:  When counsel repeatedly refers to facts in the record that
> simply are not there, <u>Herzfeld & Stern v. Blair</u>, 769 F.2d 645, 647
> (10th Cir. 1985); when counsel does "not raise any issue at any
> level of review that has not already been addressed by this court or
> other circuits numerous times, <u>Moulton v. Comm'r of Internal
> Revenue</u>, 733 F.2d 734, 735 (10th Cir.), <u>modified on other grounds
> by</u> 744 F.2d 1448, 1448-49 (10th Cir. 1984); when an appeal is
> "hopeless . . . under any reasonable analysis" and "vexatious at
> least in part because [the] briefing obfuscated the legal issues and
> complicated the defendants' and the court's task of sorting them
> out," <u>Braley [v. Campbell</u>, 832 F.2d 1504, 1509 (10th Cir.
> 1987)(en banc)]; and when counsel "submit[s] rambling briefs that
> make no attempt to address the elements requisite to obtaining
> reversal, . . . [f]ails to explain how the lower tribunal erred or to
> present clear or cogent arguments for overturning the decision
> below, . . . [and] cite[s to] inapplicable or irrelevant authorities, or
> misrepresent[s] facts or law to the court."  <u>Gallegos v. Jicarilla
> Apache Nation</u>, 97 Fed. Appx. 806, 813-14 (10th Cir.
> 2003)(unpublished).

In neither <u>Lewis</u>, nor any of the cases cited there, did the circuit court apply a heightened

standard of proof.

My decision is the same under either standard.  The evidence that Ms. Garcia

intentionally fabricated documents relied on in her appeal is unrebutted, overwhelming, and

satisfies both the preponderance of the evidence and the clear and convincing standards of proof.

II.

A.  The Durkin Letter

Ms. Garcia was granted leave in the circuit court to supplement the record with a letter purportedly written by Craig E. Durkin and printed on what appears to be the letterhead of the Office of the Secretary for Administration, United States Department of Housing and Urban Development (the "Durkin Letter").[2]  The Durkin Letter is Appendix 4 to Appellant's Supplemental Appendix in the circuit court.  Based on unrebutted and overwhelming evidence, I find that Ms. Garcia fabricated the Durkin Letter.

Mr. Durkin testified at the Evidentiary Hearing by deposition.  The transcript of his deposition testimony includes the following:

> Q:      And Mr. Durkin, in 1999 by whom were you employed?
>
> A:      Department of Housing and Urban Development.
>
> Q:      Generally, what were your job functions?
>
> A:      I was the head of the Office of Procurement and Contracts, reported to the chief procurement officer of the department.
>
> Q:      Did you know Tina Garcia?
>
> A:      No, I didn't.
>
> Q:      Were you familiar with her company, Special Properties, Inc.?
>
> A:      I don't recall being, having any information about it.

---

[2]The Durkin Letter was admitted into evidence at the Evidentiary Hearing as Exhibit D-6. Trans. [Doc. # 507] at p. 9 line 16.

> Q:      I'd like to have you look at Exhibit D-6, which is before you.  This purports to be a letter from you to Ms. Garcia dated September 11, 1999.  Did you author this document?
>
> A:      No, I didn't.
>
> Q:      Is this, the content of this letter typical of the job function that you had to out letters like this?
>
> A:      No, I never would send out a letter like this.

Deposition of Craig Durkin [Doc. # 513] (the "Durkin Depo.") at p.4 lines 2-20.   Among the indicia of the false origin identified by Mr. Durkin are the following:

(1)      Mr. Durkin stated that he would never make comments like those contained in the Durkin Letter.  For example, the Durkin Letter states that based on past performance, Ms. Garcia's company would be given "priority consideration of future contracting opportunities. . . ."  Exh. D-6.  However, Mr. Durkin testified that "[i]n any case, I wouldn't as a head of the contracting office be giving any indication to anyone that they would receive priority consideration."  Durkin Depo. [Doc. # 513] at p. 6 lines 6-8.  "I would characterize language like that would be an anathema to any kind of contracting official.  They would never put in writing that they would give priority consideration to a firm."  Id. at p. 5 lines 27-30;

(2)      The Durkin Letter is unsigned, contrary to Mr. Durkin's normal practice.  Id. at lines 18-21;

(3)      The Durkin Letter is dated September 11, 1999, which was a Saturday.  Mr. Durkin testified that he "would not go into the office on a Saturday for something like this."  Id. at p. 7 lines 3-7; and

(4)      Finally, there are irregularities in the letterhead.  Mr. Durkin testified:

> Well, it doesn't look like any, the letterhead doesn't look like anything I'm use to.  Well, first of all, my, the signature block under my name is incorrect.  I was never the director of the Office of Procurement.  It was the Office of Procurement and Contracts that I was the director of.  The office--the letterhead has the Office Of The Secretary For Administration.  Well, prior to the reorganization that I eluded to in early 1999 we worked for the Assistant Secretary for Administration.  I believe there is a letterhead that said Assistant Secretary for Administration.

Id. at p. 7 lines 16-27.

The Durkin Letter originated from Ms. Garcia when she was granted leave by the circuit court to file a supplemental index.  Its authenticity was vouched for in Ms. Garcia's Response to Appellee's Motion to Strike Supplemental Appendix [etc.] [10th Cir. Doc: 01016866830] at p. 5 (stating that "[t]he correspondence from HUD to Ms. Garcia, at Appendix #3 and #4 of her Reply Brief, confirm that HUD was very appreciative of Ms. Garcia's efforts in this incident; that she and her company were not at fault in any manner; and conclusively refute the insinuation of wrongdoing created by Appellees").

That the fabrication was knowing and intentional cannot be doubted.  Ms. Garcia not only  created a false letter, but she went to extreme lengths to attempt to make the Durkin Letter appear authentic, including the creation of false letterhead.

### B.  Medical Release Authorizations

In June 2008, after the district judge granted summary judgment for the defendants and accepted my recommendation that the plaintiff's claims be dismissed as a sanction, Ms. Garcia filed in the district court a Motion for Relief From Order [Doc. # 358, filed 6/9/2008] (the "Rule 60(b) Motion").  Ms. Garcia argued in the Rule 60(b) Motion that the district judge erred when he found that "[p]laintiff did not provide Berkshire with the requisite authorization forms to

establish proof of loss until February of 2007." Rule 60(b) Motion [Doc. # 358] at p. 12.  In

support of her assertion of error, Ms. Garcia attached to the Rule 60(b) Motion two exhibits

captioned "Authorization to Obtain Information," see Ex. 1 [Doc. #358-2] (the "12/15/2003

Authorization") and Ex. 2 [Doc. # 358-3] (the "5/15/2004 Authorization") (collectively the

"Medical Authorizations"), purportedly signed by Ms. Garcia on December 15, 2003, and

May 15, 2004.  She argued that Berkshire made a "[d]eliberate misrepresentation" to the district

court; "concealed that Defendants had Plaintiff [sic] medical release authorization forms from

December 2003 to April 2005"; and "did not disclose the existence of Plaintiff's Authorizations

for Release of Medical Records, dated December 15, 2003 and May 15, 2004." Rule 60(b)

Motion [Doc. # 358] at p. 13.  The Rule 60(b) Motion "and all exhibits and attachments" were

made a part of the record in the circuit court at Ms. Garcia's request.  Supplemental Motion to

Appellant's Motion to Proceed on the Record on Appeal [10th Cir. Doc: 01014945063] at p. 10.[3]

Based on unrebutted and overwhelming evidence, I find that Ms. Garcia fabricated the

Medical Authorizations.

The Medical Authorizations each bear a stamp in the lower right-hand corner (the

"Claims Stamp").  The Claims Stamp on the 5/15/2004 Authorization states clearly "CLAIMS

MAY 17, 2004."  The Claims Stamp on the 12/15/2003 Authorization is faint and difficult to

read, but appears to state "CLAIMS DEC 15," and thereafter becomes illegible.

---

[3]Copies of the Medical Authorizations were admitted into evidence at the Evidentiary
Hearing as Exhibit D-9.  Trans. [Doc. # 507] at p. 9 line 16.

The unrebutted evidence establishes that the Medical Authorizations are not in Berkshire's file concerning Ms. Garcia's claim.  Paul Cormier, Berkshire's claims manager responsible for Ms. Garcia's claim, testified:

> Q:      Ms. Garcia claims that she sent these two authorizations contained in Exhibit D-9 to Berkshire, which at some point stamped them in.  In your review of Berkshire's claims file for Ms. Garcia could you find these authorizations?
>
> A:      No.  I reviewed the file several times and they are not in the claim file.

Trans. [Doc. # 507] at p. 51 line 20 through p. 52 line 1.

The unrebutted evidence establishes that the Claims Stamp does not match the stamp used by Berkshire's claims department.  Again, according to Mr. Cormier:

> Q:      Now I'd like to turn to the issue of the claims stamps.  On the face of D-9 we will see at the bottom right-hand corner, and I'm looking at the first one in December, through a kind of blurry stamp.  Do you see that?
>
> A:      Yes, I do.
>
> Q:      And then on the second page, which appears to be the same document but countersigned, and we have a little bit clearer one.
>
> A:      I see it.
>
> Q:      When documents are received by Berkshire does it stamp them in some way as reflecting that it had been received?
>
> A:      Yes.  It will stamp them with a stamp that says "claims" and then it will give the date by month, day and year that the document is being stamped.
>
> Q:      And is this the type of claim stamp that Berkshire used between 2002 and the present?

> A:      No, because the font is clearly different than any font on
> any date stamp that's been used by our claims administrator
> support staff in all the time that I've been there.

Id. at p. 58 line 20 through p. 59 line 16.

Mr. Cormier testified that Exhibit D-26, admitted into evidence at the Evidentiary

Hearing, id. at p. 112 line 22, is an exemplar of all of the claims stamps used by the Berkshire

claims support staff during the relevant time frame.  Id. at p. 59 line 17 through p.61 line 13.

The fonts of the claims stamps used by Berkshire, and evidenced on Exhibit D-26, differ from

the font of the Claims Stamps appearing on the Medical Authorizations.  As Berkshire has

explained:

> The stamp on [Exhibit D-9] is a consistently thick, even-sized font,
> which is not present on Berkshire's original documents [evidenced
> by Exhibit D-26].  The style of the numbers is different.  Ms.
> Garcia's numbers use the number "1" without a serif, or flat line
> on the bottom of the number; Berkshire's "1" has the serif.  Ms.
> Garcia's number "4" is closed, but Berkshire's "4" is open.  The
> spacing between the word "CLAIMS" and the date is out of
> proportion to Berkshire's normal stamp.

Opposition to Plaintiff's Motion for Relief From Order [Doc. # 362, filed 7/21/2008] (the

"Response to Rule 60(b) Motion") at pp. 7-8.

When this irregularity was pointed out by Berkshire in July 2008 in the Response to Rule

60(b) Motion, Ms. Garcia concocted an explanation.  According to Ms. Garcia:

> Defendants' are desperate to discredit these documents [the
> Medical Authorizations] because they completely undermine
> Defendants' defense and the underpinning of the [district court's]
> Summary Judgment . . . that Berkshire did not have sufficient
> documentation to reach a decision on Ms. Garcia's disability until
> February 2007.  This reply will clearly show that these three
> documents are authentic.
>                          *     *     *

In their Response, Defendants allege these two additional medical records release authorizations are forgeries because: (1) of a difference in the date stamp format on the documents from that allegedly used at the Defendants' home office; (2) Defendants cannot locate the documents in their home office file; (3) the only way Plaintiff would have received the documents was through discovery and the documents would have had Defendants' bates stamp which they don't; and (4) the May 15 2004 records release could only have been received at Defendants' home office in Massachusetts if it was fax'd and there is no fax banner on that document.

Defendants' above forgery allegation is based on an erroneous premise . . . that the documents were sent to Defendants' home office in Massachusetts.  Evidence shows that the documents were sent to the Defendants' claim representative in Colorado Springs, Ms. Barbara Vinchattle, for processing, to include the use of her own unique date stamp in maintaining her local claims file. Evidence shows that Plaintiff, through her Conservator or attorney, received these documents directly from Ms. Vinchattle or Mr. Kimball, Defendants' in-house counsel, before or outside formal discovery.

Plaintiff's Reply to Defendants' Opposition to Plaintiff's Motion for Relief From Order [Doc. # 372, filed 9/3/2008] (the "Reply In Support of Rule 60(b) Motion") at pp. 37-39.

Contrary to Ms. Garcia's explanation, there is no evidence that the Medical Authorizations were sent to Ms. Vinchattle, and it is unrebutted that Ms. Vinchattle never used a date stamp.  Trans. [Doc. # 507] at p. 66 lines 7-24.

In an attempt to bolster her false explanation, Ms. Garcia altered 12 additional documents by affixing a false Claims Stamp, similar to the one contained on Exhibit D-9, in an attempt to prove that Ms. Vinchattle used such a stamp.  The unrebutted evidence is that these documents, admitted into evidence at the Evidentiary Hearing as Exhibit D-25, id. at p. 76 lines 6-10 and p. 112 lines 15-16, have been altered to add false claims stamps.

Ms. Garcia's fabrication of the Medical Authorizations was knowing and intentional. Their importance to Ms. Garcia's case (which establishes her motive for fabricating them) is made clear in her Reply In Support of Rule 60(b) Motion [Doc. # 372] where Ms. Garcia argued that the fabricated Medical Authorizations "completely undermine [Berkshire's] defense. . . ." Id. at p. 37.  The authenticity of the Medical Authorizations was vouched for in Ms. Garcia's Reply In Support of Rule 60(b) Motion [Doc. # 372] (stating that "[t]his reply will clearly show that these . . . documents are authentic").  Id.  After Berkshire demonstrated that the documents were fabricated, Ms. Garcia altered other documents in an attempt to bolster her claim that the Medical Authorizations were authentic.  Thus, Ms. Garcia lied in an attempt to cover her earlier lies.  As noted in my previous recommendation, "the plaintiff's willingness to lie knows no bounds."  Amended Recommendation [Doc. # 296] at p. 13.

## C.  The Renfro Report

Finally, in what Berkshire characterizes as a "shocking" series of events, Trans. [Doc. # 507] at p. 8 line 3, the unrebutted evidence demonstrates overwhelmingly that Ms. Garcia planted a fabricated document in the files of the Colorado Board of Law Examiners and later relied on that fabricated document in her Rule 60(b) Motion and on appeal.

Patrick Renfro is an expert in the area of vocational rehabilitation.  He was retained in this case by Ms. Garcia.

I previously found that Ms. Garcia fabricated a report, purportedly written by Mr. Renfro and dated February 23, 2006, and submitted it to the Colorado Board of Law Examiners (the "fabricated Renfro Report").  Specifically, I found:

> Mr. Renfro prepared an expert report in connection with his
> services as an expert witness in this case and forwarded it to the

14

plaintiff on January 23, 2006, for her review.  The plaintiff was able to modify the text of the report.  One month later, the plaintiff submitted a report to the Colorado Board of Law Examiners purportedly prepared by Mr. Renfro.  The second report is similar to the first, but contains significant changes.  For example, Mr. Renfro's first report is 21 pages in length; the second Renfro report is only six pages long.

More significantly, the second report deletes Mr. Renfro's finding that the plaintiff has a "mild to moderate head injury" and reports the injury as moderate only; deletes entirely Mr. Renfro's conclusion that the plaintiff suffers from depression; alters a quotation relied on by Mr. Renfro from Dr. Dodson by adding that the plaintiff requires an accommodation of "double time"; and alters a quotation relied on by Mr. Renfro from Mr. Schroener by deleting a statement that the plaintiff suffers from, among other things, "clinical anxiety and depression."

Amended Recommendation [Doc. # 296] at p. 5 (internal citations omitted).

On November 14, 2007, at the First Hearing, I asked Berkshire's counsel whether she could tell "how the Colorado Board of Law Examiners obtained the Renfro letter."  She responded that she could not.  Transcript of Proceedings on November 14, 2007 [Doc. # 301] at p. 92 lines 1-3.

Susan Quinn Gleeson, the executive director for the Colorado Board of Law Examiners, testified at the Evidentiary Hearing.  Trans. [Doc. # 507] at p. 19 line 10 through p. 20 line 5. Ms. Gleeson is familiar with Ms. Garcia, id. at p. 20 lines 17-22, and with her file.  Id. at p. 23 lines 3-11.  Most of the documents in Ms. Garcia's file were hand delivered to the Board of Law Examiners by Ms. Garcia.  Id. at p. line 25 through p. 24 line 4.  Ms. Garcia's file at the Board of Law Examiners contains the fabricated Renfro Report.  Id. at p. 22 line 25 through p. 23 line 2. The fabricated Renfro Report contained in Board of Law Examiners' file appears as an original

document; unsigned; on heavy bond paper; without any fax banner or other indication that it was transmitted by facsimile; and without a Bates stamp.

Ms. Gleeson described her familiarity with the fabricated Renfro Report as follows:

Q:     With respect to the Renfro report in particular, were any requests made of you?

A:     I was asked several times to at least look at the file and see if I could locate a document from Patrick Renfro that contained a fax header at the top of the page.

Q:     And as maybe background for that, describe the condition, the physical condition of the Renfro report that you did have in your file that you produced to Holland & Hart.

A:     The Renfro report that we had in the file was--appeared to be an original document on heavy bond paper with no signature, and it was dated February 23rd of 2006.

Q:     Was there an envelope with the document?

A:     There was no envelope.  There were not--there was not even a date stamp, although--

Q:     If--

A:     But nothing to indicate from where the report came.

Q:     Was there a fax cover sheet?

A:     There was not.

Q:     Or a fax notation on the document?

A:     There was no indication that there was--anything had been faxed from--with regard to the Renfro report.

Q:     Did you specifically look for something like that?

A:     I did.  I looked several times.

Id. at p. 24 line 18 through p. 25 line 18.

In April 2008, Ms. Garcia and her lawyer at the time, Jeffrey Nobel, were allowed to examine the original file at the Board of Law Examiners.  In the course of that examination, Ms. Garcia and Mr. Nobel suddenly and without any reasonable explanation "discovered" a different version of the fabricated Renfro Report, this one with a fax banner and a Bates stamp.  Ms. Gleeson, who was familiar with the file and, in particular, with the fabricated Renfro Report, was surprised by the alleged discovery of this different version of the report.

Ms. Gleeson's unrebutted testimony discloses that the following events occurred during Ms. Garcia's April 2008 inspection of her file at the office of the Board of Law Examiners:

> Q:   And at some point did you allow her [Ms. Garcia] access to physically inspect the file?
>
> *   *   *
>
> A:   It was in April of 2008.
>
> Q:   Describe who came with her, what time they arrived?
>
> A:   Jeffrey Noble and Ms. Garcia actually came to the office a few days prior to the April 25th date hoping, I think, to look at the file since they were physically there, and we turned them away.  I told them no, it was against policy and after quite a long discussion with Mr. Noble I spoke to our executive director and we agreed that it would--we would allow them to come back on another day and made arrangements to view the file under some supervision.
>
> Q:   Describe the supervision you mentioned.
>
> A:   One of our staff people, Gloria Lucero, was asked to sit in the conference room with Mr. Noble and Ms. Garcia while they reviewed the file.
>
> *   *   *
>
> Q:   In the many times that you reviewed the file looking for a source identifier, how long at most would it take you to go through those pages?
>
> A:   I'm generous here, no more than 20 minutes.  Probably more like 10 or 15.

Q:      What time did Ms. Garcia arrive to inspect the file?

A:      At 2 p.m.

Q:      And when did she leave?

A:      At about 4:40 p.m.

Q:      Were you--did you periodically observe them in the conference room or--

A:      They were in the conference room, we left the door open. Ms. Lucero was in the conference room with them during most of the time, to the best of my knowledge.  And given that the door was open, I was working in my office but I had many occasions to go up front and I would, you know, just look through the doorway and I could see Ms. Garcia and Mr. Noble having their discussion and, you know, heads over the file going through the pages.

Q:      Did you eventually speak with them toward, you know, after 4--

A:      I did.

Q:      --p.m.?

A:      I did.  Ms. Lucero indicated that they wanted copies of some of the documents they found in the file, and I went in to talk to them about that while she was making copies.  And Mr. Noble presented to me a document with a Bates Stamp at the bottom and indicated that he thinks he had found the document that they'd been looking for. . . .

Q:      . . . [C]ould you look, please, at Exhibit D-1.

A:      All right.  I have it.

Q:      And can you tell if this is the document that you were shown?

A:      It appears to be the document that I was shown.

Q:      Based on your prior review of the file, had this document ever been in the file?

A:      Not to my knowledge.

Q:      Now, tell me a little bit more about the circumstances under which this is presented to you.  You're speaking with Mr. Noble, I think you said?

A:      Yes.  I came in, actually, to tell them that we were getting close to closing time and they needed to finish up their review so that we could close.  And he had this document in his hand and he said, I think we found what we're looking for so we'll be--you know, this is good timing.  Something to that effect.  And he asked me--I looked at it, and he said something about the Bates Stamp at the bottom, assuming that it was our Bates Stamp.

And frankly, I was surprised that they found this document because I had no recollection of having seen it.  And he then asked me about the Bates Stamp and said, well, Isn't this your Colorado Board of Law Examiners stamp?  And I said, No, we don't have a Bates Stamp, we don't use Bates Stamping, and there's nothing else in Ms. Garcia's file with such a stamp on it.

Id. at p. 26 line 4 through p. 29 line 24.

Ms. Gleeson also testified:

Q:      What was Ms. Garcia doing at the time you had this discussion [with Mr. Nobel]?

A:      She was--well, at first she was sitting there with a handful of tissues.  She had a cold and was making quite a scene about the tissues in her hand.  She had probably 20 tissues in her hand.  She also had her sweater on the table.  And so while I was talking to Mr. Noble she excused herself to go to the restroom, taking the tissues with her. . . .

                                    *    *    *

Q:      Had you seen her leave for the restroom periodically throughout the two and some hours?

A:      I had not observed her, but I understand from Ms. Lucero that she had gotten up and gone to the restroom several times.

Q:      Were you then alerted to an incident as you were speaking with Mr. Noble?

A:      Yes.  While Ms. Garcia was in the restroom and I was talking to Mr. Noble, Ms. Lucero took the opportunity to also go to the restroom shortly after Ms. Garcia left the room.  Ms. Garcia was leaving the restroom when Ms. Lucero came in.  And I received a note from the receptionist.  She came in and told me that there was an emergency in the bathroom and that Ms. Lucero needed to see me in the restroom immediately.

Q:      What did you find when you went to the restroom?

A:       When I went to the restroom Ms. Lucero was standing there holding a wet piece of paper, and I--she said, I just found this in the toilet.  And I asked her what it was.  And I looked at it, and it was one of the Bates--I believe it was a Bates Stamped page, but I have a copy of it, maybe it was a--it was--

                              *    *    *

It was page 4 of the--what appears to be the original Renfro report that had come from the Board of Law Examiners file, and it has no Bates Stamp.  It looks a little ragged now because it spent some time in the water.

Q:      And, it had been where?

A:      It had been wedged in the toilet as though someone had tried to flush it but it didn't go.  It was folded into four pieces, into quarters, and it had just apparently lodged in the drain and not gone all the way down.

Q:      At that point what did you do?

A:      Well, I immediately took the wet piece of paper and I went back into the conference room.  Ms. Garcia had returned to the conference room, and her and Mr. Noble were sitting where they had been previously.  And I confronted Ms. Garcia with the wet piece of paper and asked her why I had--why we had discovered this in the toilet and asked her if she had any explanation.

Q:      How did she respond?

A:      She was--she didn't know what to say.  She really had nothing to say.  She made a few incomplete sentences as though she wanted to begin to give some explanation and she stammered quite a bit, and then eventually said I don't know how that would have gotten in there unless--well, perhaps with all these tissues I

> had in my hand maybe I inadvertently picked it up without realizing it.  And I made the comment that these pages had been folded, whereas they had not previous to that, and that I did not believe her story and that it was highly suspicious.  And it would be a matter that would be reviewed by the Character and Fitness Committee should she reapply for admission.

Id. at p. 29 line 25 through p. 32 line 20.

Ms. Garcia submitted the fabricated Renfro Report with an adulterated fax banner to the district court in connection with the Rule 60(b) Motion, arguing among other things that Berkshire "misled the Court by filing the disputed Renfro abbreviated letter as an exhibit . . . in an altered state *without* the compelling fax banner with the unique 'RCS' company logo. . . ." Rule 60(b) Motion [Doc. # 358] at pp. 38-41 (original emphasis).[4]  The fabricated Renfro Report with the adulterated fax banner became a part of the record on appeal at Ms. Garcia's request when she designated the Rule 60(b) Motion "and all exhibits and attachments" in her Supplemental Motion to Appellant's Motion to Proceed on the Record on Appeal [10th Cir. Doc: 01014945063] at p. 10.

Based on this evidence, I find that Ms. Garcia knowingly and intentionally altered a copy of the fabricated Renfro Report to add a fax banner; surreptitiously placed this twice fabricated document into her file at the office of the Colorado Board of Law Examiners; and improperly removed page 4 of the fabricated Renfro Report and attempted to flush it down the toilet.

III.

At one point in the proceedings on remand, it appeared that Ms. Garcia would argue that she lacked the mental capacity to "intentionally" fabricate the questioned documents.  See

---

[4]The fabricated Renfro Report with the adulterated fax banner was admitted into evidence at the Evidentiary Hearing as Exhibit D-1.  Trans. [Doc. # 507] at p. 9 line 16.

[Proposed] Scheduling Order on Remand [Doc. # 417, filed 1/5/10] at Part 3(a)(2) (containing Ms. Garcia's statement that she "does not have the cognitive capacity to have illicitly fabricated these documents or any other similar sophisticated false documents"); and Part 9(d)(1) (indicating that Ms. Garcia would present expert testimony "regarding the severity of Ms. Garcia's traumatic brain injury and impact on her cognitive capacity").  That proposed scheduling order was never entered.  Instead, by an Order entered on July 21, 2010, I required the parties to submit status reports "addressing (1) what limited discovery, if any, they require to prepare for the Hearing on Remand and (2) the method for the presentation of their evidence at the Hearing on Remand."  Order [Doc. # 466] at pp. 2-3.  I also set a status conference to "address the procedures to be applied at the Hearing on Remand."  Id. at p. 3.

Ms. Garcia failed to file a status report as required and failed to appear at the status conference.  See Order [Doc. # 471, filed 8/5/2010].  Notwithstanding Ms. Garcia's failure to participate, I established the following procedures, among others:

(1)     Ms. Garcia was required, on or before August 13, 2010, to designate all expert witnesses, including any witnesses who would provide medical testimony, and to provide Berkshire with the disclosures required under Fed. R. Civ. P. 26(a)(2).  Id. at p. 2.  Ms. Garcia failed to designate any expert witnesses or provide any Rule 26(a)(2) disclosures;

(2)     The parties were allowed to depose any experts designated pursuant to the order.  Any other deposition required leave of court.  Id.  Ms. Garcia did not seek leave to take any depositions; and

(3)     The parties were required to exchange and file witness lists, exhibit lists, and copies of exhibits.  Id. at p. 3.  Ms. Garcia did not comply.

22

As a result of Ms. Garcia's failure to make expert disclosures, among other things, Berkshire filed its Motion for Sanctions [etc.] [Doc. # 474, filed 8/20/2010] (the "Motion for Sanctions").  The Motion for Sanctions seeks an order precluding her from "introducing evidence of her alleged incapacity to falsify records."  Id. at pp. 11-13.

Pursuant to Fed. R. Civ. P. 37(c)(1), a party who fails to provide information or identify witnesses under Rule 26 "is not allowed to use that information or witness to supply evidence . . . at a hearing . . . unless the failure was substantially justified or is harmless."  In determining the appropriateness of excluding evidence or testimony under this Rule, a court should examine (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such evidence would disrupt proceedings; and (4) any bad faith or willfulness.  Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co., 170 F.3d 985, 993 (10th Cir. 1999).

Ms. Garcia failed to participate at the Evidentiary Hearing and did not attempt to introduce any evidence or expert testimony concerning her disability and its impact on her ability to act intentionally.  She would have been precluded under Rule 37(c)(1) and the Woodworker's case from presenting any such evidence, however, because her failure to make expert witness disclosures as required was neither justified nor harmless.

On the record now before me, there is no evidence supporting a claim of mental incapacity preventing Ms. Garcia from acting intentionally.  I find that her fabrication of documents as specified in Part II, supra, was knowing and intentional.

IV.

The circuit court's order on remand requests, upon a finding of intentional fabrication of documents, a calculation of a "reasonable award of attorney's fees for the appeal." Garcia, 569 F.3d at 1183. The reasonable and necessary attorneys fees incurred by Berkshire beginning with Berkshire's receipt of Garcia's Opening Brief and Appendix through the issuance of the circuit court's Opinion and Judgment on June 10, 2009, and for which Berkshire makes a claim is $35,189.50.

Berkshire, however, requests a much larger award. In addition to its attorneys fees for the appeal, Berkshire argues that Ms. Garcia has engaged in "exceptional gross misconduct" on remand, Post-Hearing Brief [Doc. # 512, filed 1/7/2011] at p. 11--"misconduct that includes not only the fraud she perpetrated on the Court and Berkshire, but also her vexatious, exponential multiplication of proceedings since the Court of Appeals decision in this case." Id. As a result, Berkshire urges that the circuit court should invoke Fed. R. App. P. 38 to award "just damages" not only for the fees incurred in briefing the appeal, but for all of Ms. Garcia's "post-filing conduct." Id. at p. 9. Berkshire's reasonable and necessary attorneys fees for the appeal and in connection with all matters on remand total $87,737.50.

The circuit court has previously awarded attorneys fees under Rule 38 against a litigant who, like Ms. Garcia here, "unreasonably and vexatiously multiplied the proceedings . . . by filing a frivolous appeal and by . . . other filings. . . ." UFCW Local 880 v. Newmont Mining Corp., 261 Fed.Appx. 105, 110 (10th Cir. 2008)(unpublished)(cataloguing the abusive "other filings" as including a petition of writ of mandamus, a motion for stay pending appeal, and a motion to show cause and for sanctions, all of which were denied).

Berkshire also relies on State Industries, Inc. v. Mor-Flo Industries, Inc., 948 F.2d 1573 (Fed. Cir. 1991), a case which resembles this one although with less egregious facts, to support its request for all attorneys fees expended on remand.  In State Industries, the Federal Circuit found that the appellant (State) had asserted in its brief on appeal "half-truths and illogical deductions from misused legal authority."  Id. at 1580.  The Federal Circuit then observed:

> In its brief, Mor-Flo challenged State's appeal, and we thus expected State either to respond to the charge of frivolity or to withdraw its appeal.  It did neither.  Instead, it proceeded to file a reply brief which simply ignored the allegation of frivolity *and compounded the misconduct with more frivolous assertions*.
>
> *            *            *
>
> Sanctions are awarded to compensate the victimized party for the burden of continued litigation in what long ago should have been a settled matter, as well as to discourage frivolous appeals which unnecessarily clog our docket.  It would be ironic indeed were an adjudication of frivolity to impose on the opposing party and on the court an even greater burden in dealing with a frivolous appeal and entirely defeat the purpose of Rule 38.

Id. at 1580, 1582 (internal quotation, citations, and note omitted; emphasis added).

Although the circuit court, by its plain language, requested only a finding of  a "reasonable award of attorney's fees for the appeal," I am convinced that when it learns of Ms. Garcia's misconduct on remand, it will determine that an award of all of Berkshire's attorneys fees for the appeal and on remand is warranted and required.

The circuit court issued its Mandate on September 17, 2009.  On February 2, 2010, the district judge issued a Supplemental Order of Reference [Doc. # 421], directing me to "[c]onduct hearings, including evidentiary hearings, and to submit proposed findings of fact and recommendations for rulings on" the issues remanded from the circuit court.  Id.  Immediately

thereafter, Ms. Garcia embarked on a pattern of vexatious filings which enormously expanded and multiplied the proceedings on remand.

On February 10, 2010, Ms. Garcia filed two virtually identical motions seeking my disqualification and that of the district judge. Plaintiff's Motion for the Recusal or Disqualification of Judge Babcock and Magistrate Judge Boland [Docs. ## 427 and 428]. These initial two motions to disqualify were stricken. Minute Order [Doc. # 434].

On February 12, 2010, Ms. Garcia filed a third motion to disqualify, Plaintiff's Motion for the Recusal or Disqualification of Judge Babcock and Magistrate Judge Boland [Doc. # 431]; and on March 15, 2010, she filed a fourth motion to disqualify. Plaintiff's Motion to Disqualify Magistrate Boland and Judge Babcock and/or a Motion for Substitution [Doc. # 444]. Berkshire responded. The third and fourth motions to disqualify were denied. Order [Doc. # 450, filed 4/21/2010] (denying the request to disqualify Judge Babcock); Order [Doc. # 452, filed 6/3/2010](denying the request to disqualify Magistrate Judge Boland).

On February 19, 2010, Ms. Garcia filed two more motions. The first was captioned Plaintiff's Motion for Reasonable Accomodation [sic] for Physical Traumatic Brain Injury Disability [Doc. # 436] (the "Motion for Accommodation"), and sought, among other things, "[o]ption to file pleadings verbally, additional time to meet scheduling requirements, real time court reporting, additional breaks during hearings, training of court's technology system, adjustments to court lighting and sound systems, and trial advocate assistant." Id. at p. 4. She also filed Plaintiff's Motion In Limine to Exclude Claims Under Rules 26(A), for Berkshire's Failure to Certify the Release of the Claims File [Doc. # 437] (the "Motion In Limine"). The Motion In Limine is rambling, but generally alleges without any factual support that "Berkshire

26

failed to certify the production of the entire claims file, preventing Plaintiff from explaining or defending against Berkshire's unsupported fraud allegations. . . ." Id. at p. 2.  On February 26, 2010, Ms. Garcia filed a Motion for Protective Order and a Hearing on the Merits [Doc. # 441] (the "Motion for Protective Order").  The Motion for Protective Order was also rambling, but generally sought to prevent Berkshire from reopening discovery.  Berkshire responded to these motions, and I set them for hearing.  Ms. Garcia failed to appear for the hearing or to contact the court in any way, and I denied the Motion for Accommodation, Motion In Limine, and Motion for Protective Order as abandoned.  Order [Doc. # 466, filed 7/21/2010].  I cautioned Ms. Garcia that her "failure to appear at future hearings may result in the imposition of sanctions against her." Id.

On April 9, 2010, Ms. Garcia filed Plaintiff's Motion to Dismiss for Lack of Subject Matter Jurisdiction, Under Rules 60(b)(4) and 12(h)(3); Fees, Costs and Expenses Under § 1447(c), Remand to State Court, and In the Alternative an Evidentiary Hearing [Doc. # 448] (the "Motion to Dismiss").  On June 8, 2010, Ms. Garcia filed a Motion for Relief From a Void Judgment Under 12(b)(1) and Supplemental Motion to Remand Back to State Court [Doc. # 454] (the "Motion for Relief").  Berkshire responded to the Motion to Dismiss.  Subsequently, on June 10, 2010, I struck the Motion to Dismiss and the Motion for Relief, finding that they were redundant and part of a pattern of litigation misconduct:

> I find that the plaintiff is engaged in a pattern of abusive litigation conduct.  Specifically, the Motion to Dismiss is 35 pages in length and is supported by 136 pages of exhibits.  The redundant Motion for Relief is 10 pages in length and is supported by 22 pages of exhibits.  Multiple motions addressed to the same issues waste judicial resources and impose an undue burden on the opposing party.  In addition, the issues raised in these motions do not require 45 pages of briefing and more than 150 pages of exhibits.

> This is not the first time the plaintiff has engaged in redundant
> filings. In connection with her attempts to disqualify the district
> judge and me, the plaintiff first filed Plaintiff's Motion for Recusal
> or Disqualification. . . .   Subsequently, the plaintiff filed a
> redundant Motion to Disqualify. . . .

Order [Doc. # 456, filed 6/10/2010] at p. 2.  Significantly, however, I expressly stated that my

order striking the motions was without prejudice "to allow the plaintiff to file a renewed motion

addressing the jurisdiction of the court."  Id. at p. 2.

Ms. Garcia objected to my Order striking the Motion to Dismiss and Motion for Relief,

Objection [Doc. # 457, filed 6/16/2010], and the district judge overruled the Objection.  Order

[Doc. # 464, filed 7/6/2010].

After June 16, 2010, Ms. Garcia generally stopped participating in the proceedings.  She

failed to submit a status report addressing the discovery she needed in order to prepare for the

Hearing on Remand, and she failed to appear at the status conference to discuss the manner of

proceedings at the Hearing on Remand.  Order [Doc. # 471, filed 8/5/2010].  She failed to

comply with my order that she produce certain documents.  Id. at pp. 2-3; Defendants' Motion

Regarding Proposed Sanction [Doc. # 472, filed 8/13/2010] at p. 2.  She failed to make expert

witness disclosures and failed to serve a witness list, exhibit list, or exchange exhibits.

On December 3, 2010, less than three weeks before the scheduled Hearing on Remand,

Ms. Garcia filed a Status Report [Doc. # 496].  The document was not a status report at all, but a

last minute challenge to the jurisdiction of the court.  I recommended that the challenge be

denied, finding:

> The plaintiff waited nearly six months, until December 3, 2010, to
> renew her jurisdictional challenge.  The timing of the instant
> Motion, filed less than three weeks prior to the evidentiary hearing
> set for December 20, 3010, causes me to conclude that the Motion

> is filed for the improper purpose of delaying that hearing and is not
> a legitimate challenge to the court's jurisdiction.  My conclusion
> that the Motion is filed for the improper purpose of delay is further
> supported by the misleading caption used by the plaintiff--terming
> the filing a "status report" rather than a "motion."  The plaintiff's
> improper motive is further evidenced by her conduct in a related
> case--Garcia v. Berkshire Life Ins. Co. of America, 10-cv-00912-
> REB-MEH (D. Colo.)--where she filed a similar motion on May
> 17, 2010, challenging the court's jurisdiction. . . .  The
> jurisdictional challenge in the related case was denied, the court
> there finding that complete diversity of citizenship exists.  Garcia
> v. Berkshire Life Ins. Co. of America, 2010 WL 2691692 (D.
> Colo. July 6, 2010).

Recommendation of United States Magistrate Judge [Doc. # 501, filed 12/13/ 2010] at pp. 2-3.

An issue raised by Ms. Garcia in the Status Report was whether this action is governed

by ERISA.  Throughout the litigation, Ms. Garcia had consistently (and correctly) taken the

position that ERISA is not applicable.  Suddenly in the Status Report, Ms. Garcia argued that

ERISA did apply and somehow stripped the court of jurisdiction.  In rejecting the argument, I

noted:

> The flip-flop by the plaintiff, first disclaiming the applicability of
> ERISA and now arguing that it controls, is another example of her
> proclivity to change positions on a whim.

Recommendation [Doc. # 501] at p. 10.

I find that this conduct by Ms. Garcia following remand of the case from the circuit court

has been abusive and vexatious and has needlessly expanded and multiplied these proceedings.

Because I believe that the circuit court will agree and will find that an award of attorneys fees for

all proceedings on remand is appropriate, in addition to the attorneys fees for the appeal, and to

avoid further proceedings and the potential for further abuse by Ms. Garcia, I have made the

findings necessary to award all such fees.

V.

Berkshire's attorneys have provided detailed, contemporaneous time sheets reporting the work performed on the case, the identities of the people performing the work, and the rates billed.  I have reviewed the time sheets carefully and in detail and have received the testimony of Michael S. Beaver, the partner in charge of the case.  Based on that, I find:

A.  Michael S. Beaver

Mr. Beaver is a litigation partner at Holland & Hart with 24 years of experience.  During the period of the appeal in the circuit court, from January 20, 2008, through June 10, 2009, Mr. Beaver billed 14.5 hours to this matter.  The services provided were reasonable and necessary.  Mr. Beaver billed his time at $325.00 per hour, which is a reasonable rate.  The value of Mr. Beaver's services during the appeal is $4,712.50.

After remand, Mr. Beaver billed an additional 11.6 hours to the matter, which was reasonable and necessary.  He billed this time at $325.00 per hour.  The value of Mr. Beaver's services on remand is $3,770.00.

The total value of Mr. Beaver's services on appeal and after remand is $8,1482.50.

B.  Rachel A. Yates

Ms. Yates is a litigation partner at Holland & Hart with 20 years of experience.  During the period of the appeal in the circuit court, from January 20, 2008, through June 10, 2009, Ms. Yates billed 117.6 hours to this matter.  The services provided were reasonable and necessary.  Ms. Yates billed her time at $275.00 per hour, which is a reasonable rate.  The value of Ms. Yates' services during the appeal is $32,340.00.

After remand, Ms. Yates billed an additional 165.4 hours to the matter, which was reasonable and necessary.  She billed this time at $275.00 per hour.  The value of Ms. Yates' services on remand is $45,485.00.

The total value of Ms. Yates' services on appeal and after remand is $77,825.00.

### C.  Marcy G. Glenn

Ms. Glenn is an appellate partner at Holland & Hart with more than 25 years of experience.  During the period of the appeal in the circuit court, from January 20, 2008, through June 10, 2009, Ms. Glenn  billed 1.5 hours to this matter.  The services provided were reasonable and necessary.  Ms. Glenn billed her time at $425.00 per hour, which is a reasonable rate.  The value of Ms. Glenn's services during the appeal is $637.50.

Ms. Glenn performed no work on the case after remand.

The total value of Ms. Glenn's services on this matter is $637.50

### D.  Stephen G. Masciocchi

Mr. Masciocchi is an appellate partner at Holland & Hart with 20 years of experience.  During the period of the appeal in the circuit court, from January 20, 2008, through June 10, 2009, Mr. Masciocchi billed 0.9 hours to this matter.  The services provided were reasonable and necessary.  Mr. Masciocchi billed his time at $385.00 per hour, which is a reasonable rate.  The value of Mr. Masciocchi's services during the appeal is $346.50.

Mr. Masciocchi performed no work on the case after remand.

The total value of Mr. Masciocchi's services on this matter is $346.50.

### E.   Robert M. Thomas

Mr. Thomas is a junior associate at Holland & Hart.  During the period of the appeal in the circuit court, from January 20, 2008, through June 10, 2009, Mr. Thomas billed 3.4 hours to this matter.  The services provided were reasonable and necessary.  Mr. Thomas billed his time at $215.00 per hour, which is a reasonable rate.  The value of Mr. Thomas' services during the appeal is $731.00.

Mr. Thomas performed no work on the case after remand.

The total value of Mr. Thomas' services on this matter is $731.00.

### F.  Kim A. Browning

Ms. Browning is a paralegal at Holland & Hart.  During the period of the appeal in the circuit court, from January 20, 2008, through June 10, 2009, Ms. Browning billed 7.5 hours to this matter.  The services provided were reasonable and necessary.  Ms. Browning billed her time at rates ranging from $145.00 to $165.00 per hour.  The value of Ms. Browning's services during the appeal is $1,087.50.

After remand, Ms. Browning billed an additional 12.8 hours to the matter, which was reasonable and necessary.  The value of Ms. Browning's services on remand is $2,100.00.

The total value of Ms. Browning's services on appeal and after remand is $3,187.50.

### G.  Catherine R. Bradshaw

Ms. Bradshaw is a paralegal at Holland & Hart.  After remand, Ms. Bradshaw billed 2.8 hours to the matter, which was reasonable and necessary.  The services provided were reasonable and necessary.  Ms. Bradshaw's time was billed at $165.00 per hour, which is a reasonable rate.

The value of Ms. Bradshaw's services on this matter is $462.00.

### H. Awardable Attorneys Fees

I find that the value of the reasonable and necessary attorneys fees incurred by Berkshire for the appeal is $39,855.00.  Berkshire requests an award of $35,189.50.  Post-Hearing Brief [Doc. # 512] at p. 12.

I find that the value of the reasonable and necessary attorneys fees incurred by Berkshire on remand is $52,548.00.

I find that Berkshire is entitled to an award of attorneys fees against Tina Garcia based on a frivolous appeal and litigation misconduct on remand in the amount of $87,737.50.

### VI.

I respectfully RECOMMEND that the court adopt my findings that:

(1)      Tina Garcia fabricated the letter purportedly written by Craig E. Durkin dated September 11, 1999, filed as Appendix 4 to Appellant's Supplemental Appendix;

(2)      Tina Garcia fabricated the Medical Release Authorizations purportedly dated December 15, 2003, and May 15, 2004, attached as Exhibits 1 and 2 to the Rule 60(b) Motion;

(3)      Tina Garcia fabricated the Renfro Report with the adulterated fax banner and surreptitiously placed it in her file at the office of the Colorado Board of Law Examiners, which she subsequently attached as Exhibit 8 to the Rule 60(b) Motion;

(4)      Tina Garcia intentionally fabricated these documents;

(5)      On remand from the circuit court Tina Garcia engaged in abusive and vexatious litigation abuse that needlessly expanded and multiplied the proceedings;

(6)      The reasonable award to Berkshire for its attorneys fees for the appeal is $35,189.50; and

(7)     The reasonable award to Berkshire for its attorneys fees on appeal and for Tina

Garcia's litigation misconduct on remand is $87,737.50.

VII.

FURTHER, IT IS ORDERED that pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ.

P. 72(b), the parties have 14 days after service of this recommendation to serve and file specific,

written objections.   A party's failure to serve and file specific, written objections waives *de novo*

review of the recommendation by the district judge, Fed. R. Civ. P. 72(b); Thomas v. Arn, 474

U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions.

Makin v. Colorado Dept. of Corrections, 183 F.3d 1205, 1210 (10th Cir. 1999); Talley v. Hesse,

91 F.3d 1411, 1412-13 (10th Cir. 1996).  A party's objections to this recommendation must be

both timely and specific to preserve an issue for *de novo* review by the district court or for

appellate review.  United States v. One Parcel of Real Property, 73 F.3d 1057, 1060 (10th Cir.

1996).

Dated January 18, 2011.

BY THE COURT:

 s/ Boyd N. Boland
United States Magistrate Judge